**In re VANGUARD AIRLINES, INC., Debtor.**

**Vanguard Airlines, Inc., Plaintiff,**

**v.**

**The Sarah and William Hambrecht Foundation, et al., Defendants.**

**Bankruptcy No. 02–50802–JWV.**
**Adversary No. 03–04093–JWV.**

United States Bankruptcy Court, W.D. Missouri.

Oct. 28, 2003.

---

Amy E. Hatch, Daniel J. Flanigan, David D. Ferguson, Robert J.E. Edwards, Polsinelli Shalton Welte, PC, Kansas City, MO, for Plaintiff.

Michael D. Fielding, Robert A. Hammeke, Terrance M. Summers, Blackwell Sanders Peper Martin LLP, Cassandra L. Writz, Bryan Cave, David A. Kraft, Berman, DeLeve, Kuchan & Chapman L.C., Kansas City, MO, for Defendants.

### *MEMORANDUM OPINION AND ORDER*

JERRY W. VENTERS, Bankruptcy Judge.

This matter comes before the Court on Vanguard Airlines, Inc.'s ("Debtor") Motions to approve settlements to resolve certain secured and unsecured claims.

First, the Debtor has filed a Motion to Approve Settlement with Pegasus Aviation, Inc., TransMeridian Airlines, Inc., and Certain Affiliates of Pegasus Aviation,

Inc. (collectively "Pegasus"). The Debtor seeks approval to compromise $300,000.00 of $700,000.00 in secured indebtedness in exchange for dropping litigation against Pegasus and giving it a $58,622,802.56 unsecured claim against the estate. The Official Committee of Unsecured Creditors ("Committee") opposes the settlement, arguing that the bankruptcy estate would realize a greater benefit if the Debtor continued the litigation to avoid, recharacterize, and equitably subordinate the liens of Pegasus. The Committee further contends that Pegasus should be liable to the estate for fraudulent conveyances and preference payments received in the year prior to the Debtor's bankruptcy filing. Also before the Court is the Debtor's separate Motion to Approve Settlement with the Sarah and William Hambrecht Foundation, Shea Ventures, LLC, J.F. Shea Co., Inc., and the Hambrecht 1980 Revocable Trust (collectively "Hambrecht"). The Debtor seeks approval to compromise $600,000.00 of $1,400,000.00 in secured indebtedness owed to Hambrecht in settling litigation concerning lien avoidance, equitable subordination, recharacterization, and fraudulent transfers. The Committee opposes the Hambrecht settlement on the same grounds that it opposes the settlement with Pegasus because Hambrecht and Pegasus have nearly identical interests in the underlying litigation.

Finally, the Debtor seeks to compromise litigation against two of the Hambrecht entities, the Hambrecht 1980 Revocable Trust and J.F. Shea Co., Inc. (collectively the "Letters of Credit Lenders"), while retaining the right to partially avoid the liens held by the Letters of Credit Lenders under 11 U.S.C. § 544 of the Bankruptcy Code. The Committee also opposes the Letters of Credit Lenders settlement, arguing that the estate is not receiving any additional benefit by compromising litigation that is largely unrelated to the Pegasus and Hambrecht settlements.

The Court held a hearing on these matters in Kansas City, Missouri, on August 27, 2003, and after taking the matters under advisement, and after reviewing the law and the evidence, the Court is now prepared to approve the settlements.

## I. BACKGROUND

In 1999 and 2000, the Debtor sustained losses in excess of $31,000,000 operating its discount fare passenger airline based in Kansas City, Missouri. The Debtor's poor performance was due, in part, to antiquated aircraft, and in an effort to make its business profitable, the Debtor contracted with Pegasus to lease eight newer, more passenger-friendly aircraft.

Meanwhile, Vanguard Acquisition Company ("VAC"), which is owned by the current and former employees of Pegasus, acquired $3,250,000 of the Debtor's Series C Convertible Preferred Stock. Subsequently, VAC purchased an additional $3,500,000 of the Debtor's common stock, giving it a 37% ownership of the Debtor's voting securities.[1] Despite having a large ownership interest, neither VAC nor Pegasus directly appointed any person to the Debtor's Board of Directors. In return for the investments, the Debtor gave Pegasus a "preferred lender status" whereby the Debtor had to consult with Pegasus concerning any proposed purchase or lease of aircraft. Pegasus had the right to reject any proposed purchase and also had the right of first refusal to sell or lease similar type aircraft to the Debtor. Additionally, Pegasus provided the Debtor with a consultant, and recommended one individual to serve on the Debtor's Board of Directors.

---

1. Hambrecht also owned a large percentage of the Debtor's stock.

Unfortunately, the airline industry as a whole suffered a downturn in business and the Debtor was unable to successfully execute its business plan. As a result, the Debtor's management began focusing on obtaining federal assistance from the Air Transportation Stabilization Board ("ATSB"), which denied the Debtor's initial application based, in part, on the small scope of its operations. Nevertheless, the Debtor's new business plan was reaping some rewards and its revenues were increasing. The Debtor believed that it needed to continue aggressive growth by expanding its business—which would also prove to the ATSB that it was worthy of assistance—but it did not have any idle aircraft and did not have the capital to lease additional planes. Thus, the Debtor sought Pegasus's agreement to enter into two "wet leases" whereby the Debtor would lease the aircraft, crew and other ancillary services from Pegasus and operate those aircraft under Pegasus's operations certificate. The Pegasus wet leases called for payment in advance, and, without payment, the crew was not obligated to fly the plane.

Although the Debtor's business prospects were improving, the Debtor faced a severe cash shortage, and it was concerned that it would run out of funds before exhausting its ATSB appeals for financial assistance or before it could obtain other outside financing. Three months before filing its Chapter 11 bankruptcy on July 30, 2002, the Debtor convinced inside lenders to issue a loan in the amount of $1,500,000 (the "Bridge Loan") of which Pegasus contributed $500,000.00 and Hambrecht contributed $1,000,000. The Debtor was able to convince Pegasus and Hambrecht to loan the money because obtaining federal assistance or outside financing would result in those entities, as large unsecured creditors, being paid full value, but without the loan to "bridge" the gap until a "capital event" occurred the unsecured creditors would receive only a small portion of their total claims. The conditions of the Bridge Loan granted Pegasus and Hambrecht favorable participation rights in any equity offerings, and the right to appoint individuals to supervise the Debtor's capital expenditure program. The Bridge Loan is secured by the Debtor's accounts receivable, inventory, general intangibles, and other items. The notes accumulated interest at nine percent until maturity and fifteen percent thereafter. The current balance on the Bridge Loan is fully secured with the Debtor owing Pegasus $700,000.00 and Hambrecht $1,400,000.

Additionally, in an effort to accumulate more cash to pay its bills, the Debtor sought release of monies held by Standard Federal Bank, N.A. ("SFB"), which it kept in reserve under a merchant's agreement for credit card sales. The SFB account was created because SFB wanted a pool of funds to charge back amounts the Debtor received for tickets purchased in advance when the Debtor was unable to honor a ticket on the scheduled flight date. To release those funds, the Letters of Credit Lenders guaranteed payments of the charge-backs. In turn, the Debtor entered into a reimbursement agreement with the Letters of Credit Lenders whereby the Debtor gave security interests in property relating to its credit card sales, and it issued warrants to the Letters of Credit Lenders in its common stock. The letters of credit allowed the Debtor to have a dollar-for-dollar reduction in the reserve account, which freed up funds that the Debtor could use as working capital. Eventually, SFB was unwilling to continue processing the Debtor's credit card transactions, and it terminated all business with the Debtor on May 10, 2002. After SFB terminated its relationship, the Debtor

reached an agreement with U.S. Bank to process its credit card sales, and the Letters of Credit Lenders entered into similar negotiations with U.S. Bank to reduce the amount it held in reserve to cover charge-backs. Letters of credit were issued to U.S. Bank only when and to the extent that SFB's exposure to charge-backs was reduced, and the letters of credit in favor of SFB were no longer needed. Meanwhile, the Debtor executed security agreements in favor of the Letters of Credit Lenders in the Debtor's assets, which were related to the U.S. Bank credit card sales, and the Debtor issued more warrants to the Letters of Credit Lenders. In total, the Letters of Credit Lenders issued $3,000,000 in security for U.S. Bank.

Unfortunately, the Debtor's aggressive growth, increasing revenues, and additional working capital from the credit card processing banks were insufficient to keep the Debtor afloat. When the ATSB finally rejected the Debtor's application on July 29, 2002, the Debtor uttered its death rattle and filed its Chapter 11 petition on the following day.

After filing its bankruptcy, the Debtor rejected its leases with Pegasus. In turn, Pegasus timely filed proofs of claim resulting from the rejection of those leases, and filed an administrative claim in an unliquidated amount for the Debtor's post-petition use of the aircraft.

The Debtor also sought to avoid the liens held by Pegasus and Hambrecht securing the Bridge Loan, equitably subordinate the creditors' claims, recharacterize the creditors' interests as an equity contribution, and recover payments based on a fraudulent conveyance theory. Additionally, the Debtor sought to recoup payments made to Pegasus on its leases as preferential payments, and Pegasus was also a named defendant in the Debtor's adversary proceeding, No. 03–04400, which seeks a declaratory judgment regarding ownership of passenger facility and security fees for amounts collected from passengers who never boarded the Debtor's aircraft ("PFC Action").[2] Finally, the Debtor proceeded on nearly the same counts against the Letters of Credit Lenders, and also sought a declaratory judgment concerning what property was covered by the Letters of Credit Lenders' lien. Reviewing these causes of action, the Debtor determined that it faced significant risks associated with the merits, the time, and the expense of litigation. After extensive negotiations, the Debtor entered into a settlement agreement reducing the secured portion of the debt held by Pegasus from $700,000.00 to $400,000.00. Also, the sum of $58,622,802.56 was agreed upon as an allowed unsecured, non-priority, pre-petition claim which generally represented the value of the Debtor's aircraft leases from Pegasus.[3] In return, Pegasus agreed to withdraw its administrative expense claim, which related to the Debtor's post-petition use of its leased aircraft, and to drop any damage claims for the Debtor's breach of the leased aircraft return conditions.[4] The

---

2. The Debtor asserts that any claims against Pegasus in this adversary action will become moot in the event this settlement is approved because Pegasus will release any claim to the funds held by the Debtor that are the subject of that action.

3. The Debtor estimates that the non-priority unsecured creditors of the estate will only receive about one percent of each claim from a distribution of the estate's assets.

4. The leases generally required that the leased aircraft be returned to Pegasus in good condition and that they be repainted. The Debtor estimated that it would cost about $1,000,000 for each of the planes it leased from Pegasus to comply with the maintenance requirements under the parties' agreement.

Debtor also agreed to drop all claims arising in the Bridge Loan Lawsuit and the PFC Action against Pegasus.

Under the terms of the Hambrecht settlement, Hambrecht's secured portion of the Bridge Loan is reduced from $1,400,000 to $800,000.00, and Hambrecht is allowed two unsecured claims: $177,815.00 representing accrued interest and $144,418.00 representing accrued legal fees. The settlement includes a release of all litigation between the Debtor and the Letters of Credit Lenders with the exception of Count IV of the Debtor's Amended Complaint, which is a lien avoidance action.

## II. DISCUSSION

■ In approving a settlement agreement in a Chapter 11 proceeding, the court is required to examine the following four elements:

(1) the probability of success in litigation;

(2) the likely difficulties in collection;

(3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and

(4) the paramount interest of the creditors

*Fry's Metals, Inc. v. Gibbons (In re RFE Industries, Inc.)*, 283 F.3d 159, 165 (3rd Cir.2002). *See also Protective Committee for Independent Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424–25, 88 S.Ct. 1157, 20 L.Ed.2d 1 (1968); *Drexel Burnham Lambert Inc. v. Flight Transportation Corp. (In re Flight Transportation. Corp. Securities. Litigation)*, 730 F.2d 1128, 1135 (8th Cir.1984); *ReGen Capital III, Inc. v. Official Comm. of Unsecured Creditors (In re Trism, Inc.)*, 282 B.R. 662, 667 (8th Cir. BAP 2002).

■ In assessing the reasonableness of a settlement, "the court need not re-solve all issues, but must only identify them so that the reasonableness of the settlement may be evaluated." *Official Committee of Unsecured Creditors v. Western Pacific Airlines, Inc. (In re Western Pacific Airlines, Inc.)*, 219 B.R. 575, 579 (D.Colo.1998). "The burden of persuading the court that a settlement should be approved rests with the party proposing the settlement." *In re Hermitage Inn, Inc.*, 66 B.R. 71, 72 (Bankr.D.Colo.1986). In this case, the Debtor asserted, and seeks to compromise, the following causes of action in the Bridge Loan lawsuit against Pegasus and Hambrecht: lien avoidance, equitable subordination, recharacterization, preference, and fraudulent conveyances. The Committee generally objects to the Pegasus and Hambrecht settlements on the basis that the estate could realize a greater return through litigation.

Against the Letters of Credit Lenders, the Debtor seeks to compromise the following causes of action: the scope of the creditors' liens; recharacterization; preference; and fraudulent conveyances. The only cause of action to survive the proposed settlement with the Letters of Credit Lenders is a lien avoidance action. The Committee generally objects to the Letters of Credit Lenders settlement on the basis that the concessions are totally unrelated to the Bridge Loan litigation and because the settlement is based on inadequate consideration.

Although the Debtor asserts that there are factual and legal grounds on which the Court could find in favor of the Debtor on its respective causes of action against Pegasus, Hambrecht and the Letters of Credit Lenders, the Debtor also determined that there is a risk that the Court might rule against it. Further, pursuit of the claims on the Bridge Loan alone would likely cost the Debtor $100,000.00 in legal

fees plus any expert witness fees. Moreover, if the Debtor should litigate and not prevail on the merits, the Debtor would be contractually obligated to pay the legal fees of Pegasus and Hambrecht in defending litigation concerning the Bridge Loan.

The Court will examine each cause of action in light of the *RFE Industries, Inc.* criteria.

## 1. Probability of Success

### A. Lien Avoidance

■ In the Bridge Loan litigation, the Debtor sought to avoid the liens on aircraft parts that Pegasus and Hambrecht created to secure the Bridge Loan. The Debtor asserted that Pegasus and Hambrecht failed to perfect those liens by filing with the Federal Aviation Administration, and thus, those liens were avoidable pursuant to 11 U.S.C. § 544(a)(1). Contrary to the well-established lien avoidance provision of § 544, however, Congress created extraordinary remedies for aircraft financiers. In particular:

> [T]he right of a secured party with a security interest in equipment described in paragraph (3), or of a lessor or conditional vendor of such equipment, to take possession of such equipment in compliance with a security agreement, lease, or conditional sale contract, and to enforce any of its other rights or remedies, under such security agreement, lease, or conditional sale contract, to sell, lease or otherwise retain or dispose of such equipment, is not limited or otherwise affected by any other provision of this title or by any power of the court.

11 U.S.C. § 1110(a)(1).

■ Thus, while Pegasus may have an unperfected lien on the Debtor's aircraft parts and equipment, the right of Pegasus to retain or dispose of that equipment is not affected by any other provision of the Bankruptcy Code or by any power of the court. *See Vanguard Airlines, Inc. v. International Aero Components, Inc. (In re Vanguard Airlines, Inc.)*, 295 B.R. 908 (Bankr.W.D.Mo.2003).

### B. Equitable Subordination

■ In the Bridge Loan litigation, the Debtor argued that the security interests of Pegasus and Hambrecht should be subordinated to the claims of other creditors.[5] Equitable subordination is an unusual remedy only applied in limited circumstances. Before a claim can be subordinated, a party must show: (1) the creditor engaged in inequitable conduct; (2) the misconduct resulted in injury to other creditors or resulted in an unfair advantage to the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code. *Bayer Corp. v. MascoTech, Inc. (In re Autostyle Plastics, Inc.)*, 269 F.3d 726, 744 (6th Cir. 2001).

If they could be established at trial, allegations in this case that favor equitably subordinating the interests of Pegasus and Hambrecht include the contentions that both entities were insiders of the Debtor at a time when the Debtor was in desperate need of additional cash; both entities held substantial portions of the Debtor's equity securities; although substantial holders of equity, Pegasus and Hambrecht made the Bridge Loan in return for security interests on unencumbered property;

---

**5.** The Debtor also asserted that the liens held by the Letters of Credit Lenders should be equitably subordinated in its adversary complaint. Against the Letters of Credit Lenders, however, the Debtor generally lumped its equitable subordination and recharacterization causes of action together; thus, the probability of success of the Debtor's equitable subordination claims against the Letters of Credit Lenders is discussed, *infra*, Part II(1)(C).

the Bridge Loan was a risk-free advance by equity holders at the expense of the unsecured creditors; the cash loaned to the Debtor, in part, went to pay for the aircraft leases owed to Pegasus at a time when the Debtor was not fully paying the lessors of other aircraft; and Pegasus had a "preferred lessor status" whereby it had the right of first refusal over future aircraft leases.

In opposition to those allegations, the evidence at this point indicates that Pegasus did not have any chosen members on the Debtor's Board of Directors; the Debtor's inadequate capitalization occurred well before Pegasus and Hambrecht began contracting with the Debtor; the Debtor was the party that requested the Bridge Loan; the Bridge Loan enabled the Debtor to pay creditors other than Pegasus; and the Bridge Loan was extended in the hope that a "capital event" would soon occur where by the Bridge Lenders could reap the benefits of their agreements with the Debtor. Additionally, David A. Rescino, the Debtor's president, testified that Pegasus only received about thirteen percent of the amount due on its aircraft leases, which was roughly the same percentage as all other lessors received. Furthermore, it was Rescino—not Pegasus—who enjoyed the upper hand regarding the leased aircraft. Rescino testified that he was not too concerned that Pegasus would repossess the aircraft for non-payment because Pegasus was a large unsecured creditor and was dependent on the Debtor successfully turning its business around. Finally, Pegasus also had wet leases with the Debtor, but full payment on the wet leases was necessary because payment was due in advance and without payment the crew did not fly the aircraft.

### C. Recharacterization

The Debtor asserted recharacterization allegations against Pegasus, Hambrecht and the Letters of Credit Lenders. Unlike equitable subordination, recharacterization requires the court to determine that the money advanced to a debtor is equity—not debt—and results in a determination that the "creditor" is illegitimate because the advance of money is not a claim to begin with. *Autostyle Plastics, Inc.*, 269 F.3d at 748–49. In determining whether a debt should be recharacterized, the court should review the following factors:

> (1) the names given to the instruments, if any, evidencing the indebtedness; (2) the presence or absence of a fixed maturity date and schedule of payments; (3) the presence or absence of a fixed rate of interest and interest payments; (4) the source of repayments; (5) the adequacy or inadequacy of capitalization; (6) the identity of interest between the creditor and the stockholder; (7) the security, if any, for the advances; (8) the corporation's ability to obtain financing from outside lending institutions; (9) the extent to which the advances were subordinated to the claims of outside creditors; (10) the extent to which the advances were used to acquire capital assets; and (11) the presence or absence of a sinking fund to provide repayments.

*Roth Steel Tube Co. v. Commissioner*, 800 F.2d 625, 630 (6th Cir.1986), *cert. denied* 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987).

Allegations supporting recharacterization of Pegasus and Hambrecht's claims include the contentions that the Debtor was inadequately capitalized; the amount each party contributed to the Bridge Loan was arguably proportionate to that party's equity holdings; the Debtor was unable to obtain financing from outside sources; no payments were made on the principal or

interest; neither Pegasus nor Hambrecht ever made any demand for payment after the due date on the Bridge Note; and the Bridge Note granted additional controls over the Debtor. Additionally, Pegasus and Hambrecht had the option to convert the Note into stock in the event the ATSB application for assistance was approved.

On the other hand, the Bridge Note has a fixed maturity date; the Bridge Note has a set interest rate before and after maturity; repayment of the Bridge Note is not conditioned on the success of the Debtor's business but is fully secured by collateral; the Bridge Note is not subordinated to other creditors; the proceeds from the Bridge Note were used by the Debtor as working capital and not to purchase capital assets; and the document uses the labels of "loan" and "note." Furthermore, neither Hambrecht nor Pegasus pressed the Debtor for payment on the date the note matured on June 30, 2002, because those entities were waiting for approval from the ATSB to give the Debtor a chance to repay the Bridge Loan.

Regarding the Letters of Credit Lenders, the Debtor alleges that it granted them security interests in property relating to the credit card sales processed by SFB and U.S. Bank, and issued substantial warrants in their favor. These transaction were conducted with insiders, accomplished at a time when the Debtor was insolvent, undercapitalized, and when no outside party was likely to extend similar credit under the same terms. The Committee asserts that the value of the warrants from 1999–2001 was $3,499,000, which, in addition to the security interests of the Letters of Credit Lenders, secured a total of $4,000,000 in letters of credit issued to SFB, and $3,000,000 issued to U.S. Bank.

The Letters of Credit Lenders contend that there is no evidence of inequitable conduct to justify equitably subordinating their claims, and that they should not be punished for a good faith attempt to save a failing company. Regarding the warrants, the Letters of Credit Lenders assert that they were never exercised, and even if they had been, the Letters of Credit Lenders would have had to pay the purchase price, which would result in new funds coming into the estate. Furthermore, the letters of credit were fully secured, and the funds freed up by the Letters of Credit Lenders were used for working capital and not to acquire capital assets.

## D. Preference

The Debtor only asserted a preference cause of action against the Letters of Credit Lenders, but the Debtor also contemplated filing a preference cause of action against Pegasus. To recover on a preference action, the Bankruptcy Code provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property-

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made-

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if-

(A) the case were a case under chapter 7 of this title [11 USCS §§ 701 et seq.];

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title [11 USCS §§ 101 et seq.].

11 U.S.C. § 547(b).

For insiders, the reach-back period to recover a preference payment is one year from the date of the bankruptcy petition. 11 U.S.C. § 547(b)(4)(B). There is little doubt that some payments made to Pegasus within the year prior to filing were made while the Debtor was insolvent and were made on account of antecedent debts. Also, there is little doubt that, with an anticipated distribution to unsecured creditors of 1%, Pegasus received more from those payments than it would receive in a Chapter 7 proceeding. § 544(b). On the other hand, payments made contemporaneous with the receipt of new value in the estate, or payments made in the ordinary course of business, are not recoverable in a preference action. § 547(c)(1), (2) and (4).

The Debtor asserts that, after examining potential preference claims against Pegasus in the year preceeding its Chapter 11 petition, and after accounting for Pegasus's "new value" defense under § 547(c)(4), the potential benefit to the estate was only $20,000.00. The Committee, to the contrary, argues that Pegasus received $3.925 million in lease-related payments within one year of filing and that Pegasus only supplied $1.14 million in new value. The Committee bases this argument, in part, on the fact that Pegasus did not operate as a conduit for each of its separate affiliates who leased an aircraft to the Debtor. In opposing this argument, Pegasus and the Debtor assert that Pegasus received payments directly from the Debtor on *all* the aircraft leased by its affiliates and Pegasus would then disburse the amount owed to its various affiliates on a *pro rata* basis. Should the Court determine that Pegasus was a mere conduit and apply the defenses to preference payments in 11 U.S.C. § 547(c), then any alleged preferences would likely be far less than the $2,785,000 urged by the Committee.

Regarding the Letters of Credit Lenders, the Debtor alleges that its execution of the June 2002 agreement securing letters of credit issued to U.S. Bank was a preferential transfer because the agreement as a whole represents a transfer to or for the benefit of a creditor on account of an antecedent debt within ninety days of when the Debtor filed bankruptcy, which enabled the Letters of Credit Lenders to receive more than they would have if the Debtor had filed under Chapter 7 of the Bankruptcy Code.

On the other hand, the letters of credit allowed the Debtor to reduce the reserve accounts held by U.S. Bank which, in turn, increased the working capital of the Debtor. Thus, the Letters of Credit Lenders assert that the new security agreement covering the processing of credit card transactions by U.S. Bank provided new value, or was a transaction in the ordinary course of business. Furthermore, the agreement concerning the U.S. Bank letters of credit had the effect of freeing up funds held by SFB in its reserve account because as the exposure of SFB for dishonored tickets decreased, SFB released funds to the Debtor. In total, the Debtor calculated that if this cause of action had proceeded on the merits, a maximum value of $25,000.00 was recoverable by the estate.

### E. Fraudulent Conveyance

The Debtor asserted a cause of action against Pegasus, Hambrecht and the Let-

ters of Credit Lenders for fraudulent transfers. The Bankruptcy Code provides:

(a) (1) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily-

(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B) (i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(ii) (I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

(II) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or

(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

11 U.S.C. § 548(a).

The Debtor asserts in its complaint that the Bridge Lenders received a fraudulent transfer by virtue of the Bridge Loan because the Loan was made with the intent to hinder, defraud, or delay other creditors while giving the Debtor less than equivalent value in the transaction. Also, the Bridge Loan contained an equity conversion feature, and part of the payments were used to pay the Pegasus aircraft leases.

On the other hand, the Bridge Loan provided a direct, immediate and measurable benefit to the estate so that the Debtor could survive while it awaited a determination by the ATSB. Furthermore, regarding Pegasus, Rescino testified that Pegasus was not inappropriately singled out for greater lease payments based on the Bridge Loan; rather, all lessors of aircraft received approximately thirteen percent on the actual value of their leases, and Pegasus was not treated any differently.

Regarding the Letters of Credit Lenders, the Debtor summarily asserted that it received less than equivalent value from the security agreement and warrants issued in their favor. Contrary to the Debtor's assertions, the Letters of Credit Lenders argue that they provided the estate with an immeasurable benefit by freeing up millions of dollars for the Debtor's use. Additionally, the Letters of Credit Lenders contest the fact that the warrants they obtained were of great value considering the limited market for the Debtor's stock and the fact that they had to pay to exercise the warrants.

## F. Declaratory Judgment

In its adversary complaint, the Debtor requests that the Court render a declaratory judgment on the scope of the liens held by Pegasus and Hambrecht and the Letters of Credit Lenders. Against the Letters of Credit Lenders, the Debtor asserts that the underlying security agreements contain a typographical error in the definition section unduly broadening the scope of the liens. Specifically, the Debtor contends that a parenthetical is missing in both the February 2001 security agreement and in the June 2002 security agreement. Both security agreements use near-

ly identical language. The February 2001 security agreement states:

> "Account" means (i) any and all accounts or other distributions acquired by, owned by, owed to or payable to Grantor in any manner, whether now existing or hereafter acquired, in connection with the MNB Merchant Agreement and (ii) all rights to payments *(including, without limitation actual collections held by MNB Bank,* from Cardholders or card issuers, whether now existing or hereafter acquired, in the amount of and as a result of such transactions . . . .

[Emphasis added].

Contrary to the actual language of the agreement, the Debtor asserts that the paragraph should read:

> "Account" means (i) any and all accounts or other distributions acquired by, owned by, owed to or payable to Grantor in any manner, whether now existing or hereafter acquired, in connection with the MNB Merchant Agreement and (ii) all rights to payments *(including, without limitation actual collections held by MNB Bank)* from Cardholders or card issuers, whether now existing or hereafter acquired, in the amount of and as a result of such transactions . . . .

[Emphasis added].

The Debtor states that the Letters of Credit Lenders interpret the language in the security agreement in such a manner that broadens the scope of the property subject to their lien. With the added parenthetical, however, the Debtor asserts that the scope of the lien is properly limited. Accordingly, the Debtor is seeking to add syntax to an agreement after the parties had executed the contract.

Additionally, the Debtor seeks declaratory relief based on Section 5.6 of the February 2001 security agreement with the of the Letters of Credit Lenders, which also affects the liens held by Pegasus and Hambrecht. Section 5.6 provides:

> Limitation on Liens on Collateral. [Vanguard] shall not create, permit or suffer to exist, and shall defend the Collateral against and take such other action as is necessary to remove, any Lien on the Collateral, except (a) Permitted Liens and (b) the Lien granted to Lenders under this Security Agreement.

The Debtor asserts that the Letters of Credit Lenders interpreted this language to include one or more items used to secure the Bridge Loan. The Debtor contends that "[i]f the Letter of Credit Lenders' position is upheld on this issue, then Section 5.6 of the Letter of Credit Lenders' February 2001 Security Agreement, coupled with the language of the Bridge Lenders' May 2002 Security Agreement providing generally that the scope of the liens granted thereunder would not apply to 'Collateral that [Vanguard] pledged before the Effective Date . . . to any party other than [one of the Bridge Lenders], unless such Collateral may be subject to second (or third lien) without violating the rights of a third party . . . ,' may operate to invalidate, in part, the security interests granted by Vanguard to the Bridge Lenders in the Bridge Lenders' May 2002 Security Agreement."

 Reviewing all of the above causes of action against Pegasus, Hambrecht and the Letters of Credit Lenders, the Court finds that the Debtor's probability of success is suspect. Success on the Debtor's lien avoidance arguments faces substantial difficulties in light of the extraordinary protections granted to aircraft financiers in 11 U.S.C. § 1110. The numerous opposing factual allegations in both the equitable subordination and recharacterization causes of action demonstrate that success for the Debtor in such litigation is probable at best. The potential

recovery based on a preference action is substantially compromised by Pegasus's defenses of new value and ordinary course payments, and the extent of preferential transfers to the Letters of Credit lenders is unclear as compared to the value realized by the Debtor. Neither the Debtor nor the Committee presented a strong case for recouping payments based on a fraudulent conveyance theory. Likewise, the success of the Debtor's declaratory judgment actions is dubious, especially considering the Debtor's burden in showing that syntax should be added to a written agreement which materially limits the scope of the opposing party's interest. Thus, viewing the settlement as a whole, the probability of success factor weighs in favor of approving the settlements.

## 2. The Likely Difficulties in Collection

No party asserted that any judgment in favor of the Debtor would be difficult to collect. Because the Debtor bears the burden of showing the Court that the settlement should be approved, this factor weighs against approving the settlements.

## 3. The Complexity, Expense, Inconvenience and Delay Attending the Litigation Involved

The Debtor's lien avoidance argument concerning aircraft parts and equipment under 11 U.S.C. § 1110—that would otherwise be avoidable under § 544—is largely a legal issue, but an issue that is not well settled by the courts or commentators. *See California Chieftan v. Air Vermont, Inc. (In Re Air Vermont, Inc.)*, 761 F.2d 130, 130–31 (2nd Cir.1985) (holding that an unperfected lien on aircraft parts was protected from avoidance under 11 U.S.C. § 544 under the express language of § 1110). *Contra* Glenn A. Gerstell and Kathryn Hoff–Patrinos, *Aviation Financing Problems Under Section 1110 of the*

*Bankruptcy Code,* 61 Am.Bankr.L.J. 1 (1987) (stating that *Air Vermont* appears to be wrongly decided as a matter of statutory construction and of general Bankruptcy Code policy). In fact, when presented with the same set of facts, this Court determined that the unperfected liens of an aircraft financier are protected by 11 U.S.C. § 1110 despite the avoidance powers of § 544. *Vanguard Airlines, Inc. v. International Aero Components, Inc. (In re Vanguard Airlines, Inc.)*, 295 B.R. 908, 922 (Bankr.W.D.Mo.2003), *set aside on other grounds* 298 B.R. 626 (Bankr. W.D.Mo.2003). Thus, standing alone, the complexity, expense, inconvenience, and delay of litigation in the lien avoidance cause of action is minimal—at this level—because the Court has already indicated how it would rule on a nearly identical set of facts.

Also, the Debtor's declaratory judgment action in the Letters of Credit Lenders litigation concerns parole evidence concerning the parties' subjective intent and the objective manifestations of that intent, and whether parole evidence could be used to alter the written agreement. While not unduly complex, ascertaining objective manifestations of subjective intent is necessarily accompanied by inconvenience, delay and expense.

The Debtor's remaining claims—equitable subordination, recharacterization, preference and fraudulent conveyances—are all fact intensive inquiries. The Debtor estimates that energetic prosecution of such claims would cost the estate approximately $100,000.00 in attorney's fees not including fees for retained experts. Furthermore, if the Debtor was not successful, the estate could be contractually liable to pay the fees of Pegasus and Hambrecht's attorneys on the Bridge Loan litigation. Similarly, the Letters of Credit Lenders assert that the same expense costs and

exposure problems created by the recharacterization and equitable subordination claims with the Bridge Lenders are equally applicable to litigation concerning the Letters of Credit Lenders. Furthermore, the Letters of Credit Lenders contend that expert testimony would be needed to establish the value of the warrants received by them due to the illiquid market for the Debtor's stock. Thus, the Court finds that the complexity and expense of the litigation element weigh in favor of approving the settlements.

### 4. The Paramount Interest of the Creditors

The purpose of the paramount interest of the creditors element is to determine if a settlement maximizes the recovery of those to whom the Debtor has obligations. *RFE Industries, Inc.*, 283 F.3d at 165. The Committee argues that the additional kickers the Debtor provided to Pegasus in the settlement agreement render it unfair. Specifically, the Committee objects to $58,622,802.56 in allowed unsecured claims against the estate, arguing that there was no effort to see if any mitigation was warranted to limit the amount of damages. As Rescino testified, however, there is a surplus of aircraft for businesses to lease and the Debtor would be required to bear substantial burdens for surrendering the aircraft in breach of the return condition requirements, which Rescino estimated to be $1,000,000 per aircraft. Rescino made the business judgment to treat Pegasus's ability to mitigate its damages in a glutted market as a complete offset with the Debtor's breach of return conditions on the aircraft.

In fact, Allen Della, the Executive Vice President of Pegasus, asserts that of the eight aircraft leased to the Debtor, one was scrapped due to market conditions, three remain grounded, two were leased to Allegro Airlines, and two were leased to Aeromexico. Allegro Airlines, however, was not paying for the aircraft, and Della represented that Pegasus was a lost volume lessor because eleven aircraft were currently available for lease, and eleven more would be available for lease in the next three months. As a lost volume lessor, mitigation claims could be rendered meaningless because Pegasus could have leased two aircraft had the Debtor not breached its agreement. Thus, the Court does not find that Rescino's exercise of business judgment was unwise in offsetting the costs to return the aircraft with the duty of Pegasus to mitigate its damages in a glutted market.

Pegasus originally asserted proofs of claim totaling $61,417,104. Also, at the time of the settlement, Pegasus was preparing to amend the proofs of claim to include damages resulting from breach of the aircraft return conditions. Rescino testified that the Debtor had a total of eight aircraft leased from Pegasus, which would represent approximately $8,000,000 in costs for complying with the return condition requirements. Thus, the Debtor did reduce the amount of Pegasus's unsecured debt by approximately $10,794,301.44, which represents the difference between the estimated amount owed for breach of the aircraft return conditions, plus the amount listed in Pegasus's Proof of Claim as unsecured debt, and less the amount of unsecured debt agreed to in the settlement.

Furthermore, the reasonableness of the settlement with Pegasus is demonstrated by simple arithmetic. Pegasus represents in excess of 40% of the unsecured claims in the estate. The allowed secured claim of Pegasus is $400,000.00. To reap any benefits to the unsecured creditors by voiding Pegasus's secured claim, the Committee would have to be wholly successful and

keep the total legal fees—including the Debtor's—below $240,000.00.

Regarding Hambrecht and the associated Letters of Credit Lenders, the Committee alleges that settlement with the Letters of Credit Lenders is wholly unrelated to the Bridge Loan Lawsuit and the bankruptcy estate is not receiving fair value for the release of multiple claims against the Letters of Credit Lenders. The Committee states that the alleged consideration for the release is that the Letters of Credit Lenders agreed to limit their arguments about the scope of the security interest at issue. This "weak" concession concerned the Committee because the Debtor was surrendering a "strong" contention that the Letters of Credit Lenders were capital contributors. As noted, *supra*, Part II(1)(B–C), the likelihood of the Debtor's success on these causes of action is doubtful. Additionally, the settlement with the Letters of Credit Lenders cannot be viewed in isolation because the $600,000.00 in concessions agreed to by Hambrecht was contingent on the waiver of claims against the Letters of Credit Lenders; thus, the overall settlement cannot be viewed on a tit-for-tat basis. The Court also notes that the Debtor is not compromising its cause of action for lien avoidance against the Letters of Credit Lenders' security interests. Thus, the Court finds that the paramount interest of the creditors weighs in favor of approving the settlement as a whole because it is unclear whether a better result could be obtained after time consuming and expensive litigation.

## 5. Conclusion

 Accordingly, the Court finds that the Debtor faces significant hurdles in succeeding on the merits of its causes of action against Pegasus, Hambrecht and the Letters of Credit Lenders. Although the Debtor faces no discernable difficulty in collection, the litigation, as a whole, is both legally and factually complex and would necessarily be accompanied by significant attorney's fees on behalf of the Debtor, the Committee, and Pegasus, Hambrecht, and the Letters of Credit Lenders. Viewing the terms of the settlement as a whole, the Court finds that the paramount interest of the creditors is satisfied because it is unclear whether the estate would be better off after litigation on the merits. Additionally, the Court notes that the Debtor is maintaining a cause of action against the Letters of Credit Lenders for lien avoidance, and the estate may reap additional benefits if the Debtor is successful on that action. While the Court, or the Committee, may not have settled on the same terms as those proposed by the Debtor, the court "need only canvass the issues to determine that the settlement does not fall 'below the lowest point in the range of reasonableness.'" *In re Apex Oil Co.*, 92 B.R. 847, 867 (Bankr. E.D.Mo.1988). Based on the above discussion, the Court finds that the proposed settlements are reasonable.

## III. ORDER

Therefore, it is

**ORDERED** that Vanguard Airlines, Inc.'s Motion to Approve Settlement with Pegasus Aviation, Inc., TransMeridian Airlines, Inc., and Certain Affiliates of Pegasus Aviation, Inc., be and hereby is GRANTED. It is

**FURTHER ORDERED** that Vanguard Airlines, Inc.'s Motion to Approve Settlement with the Sarah and William Hambrecht Foundation, Shea Ventures, LLC, J.F. Shea Co., Inc., and the Hambrecht 1980 Revocable Trust be and hereby is GRANTED.